UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SUSAN GREEN,                                    *
                                                *
        Plaintiff,                              *
                                                *
        v.                                      *        Civil Action No. 1:20-cv-10241-IT
                                                *
D2L LTD. and JOHN BAKER, Individually,          *
                                                *
        Defendant.                              *

MEMORANDUM & ORDER

September 15, 2023

TALWANI, D.J.

        Plaintiff Susan Green brought this action alleging that her former employer, D2L Ltd.

("D2L"), and its Chief Executive Officer, John Baker (collectively, "Defendants"), violated her

employment contract and the Massachusetts Wage Act by invoking D2L's "windfall provision"

to reduce her earned commission on a major sales deal. Defendants seek summary judgment,

asserting that D2L has complied with the employment contract and has paid Green all earned

commissions due. For the reasons set forth herein, Defendants' Motion for Summary Judgment

[Doc. No. 144] is GRANTED.

## I.      Standard of Review

        Under Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate

when "the movant shows that there is no genuine dispute as to any material fact and the movant

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is material when, under

the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986); Baker v. St. Paul Travelers Ins. Co., 670 F.3d 119, 125

(1st Cir. 2012). A dispute is genuine if a reasonable jury could return a verdict for the non-moving party. <u>Anderson</u>, 477 U.S. at 248.

The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). This burden can be satisfied in two ways: (1) by submitting affirmative evidence that negates an essential element of the non-moving party's claim or (2) by demonstrating that the non-moving party failed to establish an essential element of its claim. <u>Id.</u> at 331.

Once the moving party establishes the absence of a genuine dispute of material fact, the burden shifts to the non-moving party to set forth facts demonstrating that a genuine dispute of material fact remains. <u>Id.</u> at 314. The non-moving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegation[s] or denials of [the] pleading[s]." <u>Anderson</u>, 477 U.S. at 256. Rather, the non-moving party must "go beyond the pleadings and by [his or] her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" <u>Celotex</u>, 477 U.S. at 324 (quoting Fed. R. Civ. P. 56(e)). Disputes over facts "that are irrelevant or unnecessary" will not preclude summary judgment. <u>Anderson</u>, 477 U.S. at 248.

When reviewing a motion for summary judgment, the court must take all properly supported evidence in the light most favorable to the non-movant and draw all reasonable inferences in the non-movant's favor. <u>Griggs-Ryan v. Smith</u>, 904 F.2d 112, 115 (1st Cir. 1990). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ruling on a motion for summary judgment." <u>Anderson</u>, 477 U.S. at 255.

II.     **Factual Background[1]**

A.     *Green's Employment with D2L*

On October 12, 2015, Green, a sales associate with nearly two decades' worth of experience in the industry, see Pl.'s Redacted Resp. to Statement of Facts ("Green Resp. SOF") ¶ 1 [Doc. No. 187]; Pl.'s Opp. Mot. SJ, Ex. 2 (Green Dep.), 84:1-4 [Doc. No. 185-2], signed an Offer Letter for a Senior Sales Executive position with D2L, an education software company. Def.'s Mem. SJ, Ex. 2 [Doc. No. 147-2]. The Offer Letter set out her annual salary ($120,000), plus her target commission (also $120,000). Id. The Offer Letter also stated that Green "w[ould] participate in D2L's sales compensation plan," and that the plan was "subject to revision in the sole discretion of management at any time." Id. Finally, the Offer Letter stated that "this offer letter … represents the entire agreement between you and D2L, and that you have received no other verbal or written agreements, promises or representations." Id.

In her role as sales executive, Green was responsible for bringing in new business from higher education institutions (e.g., colleges and universities) in the New England area. Green Dep. 105:3-5 [Doc. No. 185-2].

B.     *D2L's Sales Compensation Plan*

D2L's sales compensation plan for each year Green was employed with D2Lwas laid out in two integrated documents (together, "the Plan"): (1) D2L's Sales Compensation General Plan Provision Guide ("GPP"), Def.'s Mem. SJ, Exs. 3, 5, 7 [Doc. Nos. 147-3; 147-5; 147-7]; and (2) Green's individualized annual Goal Sheet, Def.'s Mem. SJ, Exs. 4, 6, 8 [Doc. Nos. 147-4; 147-6; 147-8]; see also Green Resp. SOF ¶ 7 [Doc. No. 187]. The Goal Sheet included a table with

---

[1] The Factual Background is based on the summary judgment record, with all properly supported disputed material facts set forth in the light most favorable to Green.

individualized commission rates and, in the sentence preceding the table, a reference to Section 3.3 of the GPP for additional commission calculation information. Def.'s Mem. SJ, Exs. 4, 6, 8 [Doc. Nos. 147-4; 147-6; 147-8].

Section 3.3 of each year's GPP, titled "Calculating Commissions," stated that: "<u>Subject to the sole discretion of the [Compensation Review Board ("CRB")]</u>,[2] commission payments are determined based on the following formulas at the ACV[3] and services commission rates specified in the Participant's Individual Goal Sheet." Def.'s Mem. SJ, Exs. 3, 5, 7 [Doc. Nos. 147-3; 147-5; 147-7] (emphasis added).

Section 5.1 of each year's GPP was the "Windfalls" provision. It read as follows:

A Windfall is a deal or portion of a deal that (a) was not forecasted sufficiently in advance, (b) was not built in to the Participant's quota, (c) results in the aggregate of the Participant's Commissionable ACV and Commissionable Service Bookings for the individual deal or portion thereof exceeding 200% of the Participant's Quota for the year, or (d) the Participant had, in the sole discretion of executive management, very limited or no influence in winning. In the event of an unusual sales situation that is determined to be a "Windfall", the Company, in its sole discretion, reserves the right to pay commission on a nonstandard basis and/or adjust quotas. A closed sale considered a windfall will be so designated prior to execution of the contract governing such sale. Only executive management can invoke the Windfall Clause.

Def.'s Mem. SJ, Exs. 3, 5, 7 [Doc. Nos. 147-3; 147-5; 147-7].[4]

---

[2] Section 8.1 of the GPP specifies that "[t]he CRB consists of the CFO or his or her designee, the head of Sales, the head of HR, the head of Sales Operations and a representative from the Finance team….The CRB meets on a monthly basis, ahead of monthly payouts, to review and approve any items that impact sales compensation." <u>Id.</u>

[3] ACV means "Annual Contract Value." Def.'s Mem. SJ, Ex. 5 [Doc. No. 147-5]. Section 3.3 of the GPP also defines the terms "Commissionable ACV" and "Commissionable Service Bookings." D2L Mem. SJ, Ex. 3. [Doc. No. 147-3].

[4] The GPP does not define "executive management" but both parties agree that executive management consists of CEO John Baker, Chief Financial Officer Brandon Nussey, and Senior Vice President of Worldwide Sales Kevin Biggs. Def.'s Mem. SJ, Ex. 12 ¶ 13 [Doc. No. 147-12]; Green Resp. SOF ¶ 42 [Doc. No. 187].

Several D2L employees made statements regarding commissions to Green around the time she began working at the company. First, Green states that before she signed the contract, Adam King, then-Director of Education Sales and Green's direct supervisor for a time, told her that D2L had "never executed" the windfall provision, and that "it's not something [Green] should even be worried about." Green Dep. 121:22-23, 122:2-3 [Doc. No. 185-2]; Green Resp. SOF ¶ 25 [Doc. No. 187]. Second, Green states that Vice President Kevin Biggs and Sales Operations Manager Tom Kane told her that "[t]here were no limitations and there were no caps" on what a sales associate could earn. Green Dep. 29:7-17, 91:2-16 [Doc. No. 185-2]. As a result of the conversations with Biggs, Kane, and King, Green believed that the windfall provision "was just legal verbiage, and that [she] could just not worry about it and disregard it." Id. at 113:22-23.

Green did not expressly discuss the windfall provision with Biggs or with any other executive at D2L (other than King) prior to signing her offer letter or the 2015 Plan. Id. at 123:7-8 ("Only Adam King was the person I spoke to about this when I got the plan and read it.").

Green read, acknowledged, and signed the Plan—including the as-excerpted language of Section 5.1, above—each year she was employed by D2L. Def.'s Mem. SJ, Exs. 4-8 [Doc. Nos. 147-4–147-8].[5]

---

[5] Plaintiff denies this fact. Green Resp. SOF ¶ 7 [Doc. No. 187]. But Plaintiff does not contend that the signatures on the Exhibits are not her own, that she did not in fact read the contracts when they were presented to her each year, or that the excepted language was not in fact present in the contracts she signed. Instead, she claims that her interpretation of the Windfall provision, discussed infra, negates the veracity of these other facts. The court finds the evidence that she read, acknowledged and signed the GPP uncontroverted.

C.    *The SNHU Proposal and Green's 2017 Goal Sheet*

Southern New Hampshire University (SNHU) is a higher education institution with a large and robust online education presence. Green Resp. SOF ¶ 30 [Doc. No. 187]. In March 2016, Green entered SNHU as a potential business opportunity into Salesforce, the sales tracking program used by D2L. Id. at ¶ 32. As part of this entry, Green was required to enter a deal forecast value; Green entered the deal at a projected value of $770,000. Id. at ¶¶ 31-32.

On February 3, 2017, Green e-signed her Goal Sheet for Fiscal Year 2018 (running from January 2017 through January 2018). Def.'s Mem. SJ, Ex. 4 [Doc. No. 147-4]. That document set her annual sales quota at $800,000, a 34 percent increase from the previous year.[6] Id.  The Goal Sheet also provided the following table for her individualized commission rates:

**Commission Rates (%)**

| Net ACV rate | Rate | Services rate | Rate |
|---|---|---|---|
| 0 % - 100 % | 17.65 % | 0 % - 100 % | 8.82 % |
| 100 % - 500 % | 35.29 % | 100 % - 500 % | 8.82 % |

In order for accelerators to take effect, the participant must hit total Annualized Quota. In addition, the participant must attain ACV equal to 50% of annualized quota for accelerators to take effect

Id. Green's Goal Sheet also set an incentive earnings number ("Annualized Variable Potential")—the amount in commission she would be eligible to earn if she met her sales quota. Id. Her 2017 target incentive earnings were $120,000. Id.

---

[6] In his deposition testimony, Baker stated that the typical sales quota for a senior sales associate was $1.2 million. Pl.'s Opp. Mot. SJ, Ex. 1 ("Baker Dep.") 142:18-22 [Doc. No. 185-1]. However, when Green received her quota in January 2017, she thought it was a fair quota. Green Dep. 134:11-13 [Doc. No. 185-2].

D.      *The SNHU Deal Closes and Green's Commission*

A team of at least nine D2L employees, including Green, worked with SNHU to develop a customized D2L product. Green Resp. SOF ¶ 34 [Doc. No. 187]; Green Dep. 168-170 [Doc. No. 185-2] (listing people on the SNHU team). On May 26, 2017, D2L submitted a proposal to SNHU; the total value of the proposed deal was $2,199,459.79 per year, with an anticipated contract term of five years. Green Resp. SOF ¶¶ 35-36 [Doc. No. 187].

On June 20, 2017, Colin McIlveen, a member of the Finance team, sent an email to CFO Nussey and Senior Vice President Biggs entitled "SNHU – Windfall Clause." Def.'s Mem. SJ, Ex. 28 [Doc. No. 147-28]. McIlveen wrote: "Maura [Theriault] and I just got off the phone regarding SNHU and we both came to the conclusion that this is a deal that falls under the windfall clause. Susan's quota is $800k, and this deal will end up being over $2m (still being calculated). If you are both in agreement, per the GPP we have to message to the team that this falls under the windfall clause prior to it being signed." Id. Nussey responded, "Ok here." Id. Biggs responded, "I think we're all in agreement here." Id. McIlveen then stated, "Will leave it to Maura to communicate to Susan." Id.

On June 21, 2017, Theriault told Green via email that the SNHU transaction would "go before our Compensation Review Board as meeting 'Windfall' criteria outlined in 5.1 of the D2L GPP. The ACV will exceed 200% of your annual quota, which requires our executive team to review and sign off on incentive payment." Def.'s Mem. SJ, Ex. 19 [Doc. No. 147-19]; Green Dep. 187:11-188:12 [Doc. No. 185-2]. In that same email, Theriault stated that "I can personally assure you that you will be well rewarded for your efforts." Def.'s Mem. SJ, Ex. 19 [Doc. No. 147-19]. In a separate conversation, Green asked Theriault how much she expected Green's commission to be. Green Resp. SOF ¶ 45 [Doc. No. 187]. Green reports that Theriault responded

"between 500 and 550,000 [dollars] is what she thought it was going to be." Green Dep. 187:22-188:8 [Doc. No. 185-2]. Green did not ask Theriault or any other D2L employee to explain how or why the Windfall provision applied to the SNHU deal. Green Resp. SOF ¶ 44 [Doc. No. 187].

On June 23, 2017, D2L and SNHU signed the deal, officially closing the sale. Id. at ¶ 46; Def.'s Mem. SJ, Ex. 17 [Doc. No. 147-17].

On July 11, 2017, the CRB met to review, among other matters, the SNHU deal. Def.'s Mem. SJ, Ex. 29 [Doc. No. 147-29]. The slide deck from that meeting indicates that the CRB discussed paying Green $240,000 in commission on the SNHU deal. Id. Other July emails between Nussey and Baker show other potential commission payment scenarios (without accelerators) ranging from $232,328 to $329,919. Pl.'s Opp. Mot. SJ, Exs. 16, 17 [Doc. Nos. 185-16; 185-17]. On July 21, 2017, Green was paid $240,000 in commission for the SNHU deal. Green Resp. SOF ¶¶ 48-49 [Doc. No. 187].

Green expressed her "disappointment" with the SNHU commission value to her supervisor, Stephan Meyer. Pl.'s Opp. Mot. SJ, Ex. 3 ("Meyer Deposition") 48-49 [Doc. No. 185-3]. Green then took a three-week vacation. Green Dep. 203:23-24 [Doc. No. 185-2]. After returning, on September 27, 2017, Green emailed Meyer to ask, for the first time, how her commission had been calculated on the SNHU deal. Id. at 202:1-8, 203:6-7, 204:9-11.

In October 2017, Green resigned from D2L. Green Resp. SOF ¶ 5 [Doc. No. 187].

### III.   Procedural Background

On January 21, 2020, Green filed her Complaint [Doc. No. 1-1] in Massachusetts Superior Court. Defendants timely removed the case based on diversity jurisdiction. Notice of Removal [Doc. No. 1]. On April 16, 2020, Green filed her operative Amended Complaint [Doc. No. 17] in this court. She alleged non-payment of wages in violation of M.G.L. c. 149, § 148,

against D2L and Baker (Count I), and breach of contract (Count II), unjust enrichment (Count III), and breach of the covenant of good faith and fair dealing (Count IV) against D2L. Am. Compl. 4-7 [Doc. No. 17]. In addition to disputing D2L's application of the Windfall Provision on the SNHU deal, Green also claimed that Defendants withheld earned commissions on deals with Springfield College and Roger Williams University. Id.

Defendants filed a Motion to Dismiss [Doc. No. 23] Counts III and IV, which the court denied. Memorandum & Order ("Mem. & Order") [Doc. No. 39].

Now pending before the court is Defendants' Motion for Summary Judgment [Doc. No. 144] on all counts. Green has filed an Opposition, see Doc. Nos. 185-188.[7] Defendants filed a Reply [Doc. No. 193] and the court heard oral argument.[8]

IV.   **Discussion**

A.  *Breach of Contract*

Green alleges that D2L breached the Plan by failing to pay her a higher commission on the SNHU deal. Am. Compl. ¶¶ 15-19 [Doc. No. 17].

Defendants argue that D2L fully complied with the terms of the Plan. Specifically, they assert that (a) the Windfall clause unambiguously applied to the SNHU deal, which was worth over 200% of Green's annual quota; (b) the Windfall clause was properly invoked prior to the

---

[7] At the summary judgment hearing, the court granted in part and denied in part Defendants' Motion to Deem Admitted, in its Entirety, Their Statement of Undisputed Material Facts and to Strike Paragraphs 1-2, 5-7, and 11 of Plaintiff's Additional Statement of Fact [Doc. No. 196]. The motion was denied to the extent that Plaintiff's response either admitted facts or responded to Defendants' facts with an evidentiary showing. The motion was granted to the extent that the court treated commentary and responses unsupported by evidence as argument only.

[8] Plaintiff's Opposition [Doc. No. 186] did not mention the commissions she claimed were due on the Roger Williams and Springfield College deals referenced in her Amended Complaint [Doc. No. 17], and at oral argument, her counsel conceded that the summary judgment record included no evidence to support the claim of unpaid commissions as to these two deals. Accordingly, the court treats claims relating to those commissions as waived.

close of the deal, by executive management; and (c) Green was timely paid $240,000 in

commission on the SNHU deal. Def.'s Mem. SJ 9-11 [Doc. No. 145]; Def.'s Rep. Mem. SJ 0-3

[Doc. No. 193].

In her Opposition, Green contends that the Windfall clause is ambiguous. On that basis,

Green seeks to introduce evidence of Adam King's statements that D2L "never" invokes the

Windfall clause to support her claim of breach. Pl.'s Opp. Mem. SJ 10-11 [Doc. No. 186].

Alternatively, Green contends that the clause could only be invoked by a unanimous consensus

of executive management and as such, the clause was not properly invoked prior to the close of

the SNHU deal. Id. at 5. Finally, Green argues that Theriault formed an oral contract on behalf of

D2L for a commission value between $500,000 and $550,000, and that D2L therefore breached

that contract by paying her only $240,000. Id. at 9. To state a claim for breach of a written

contract, a plaintiff must prove that "a valid, binding contract existed, the defendant breached the

terms of the contract, and the plaintiff sustained damages as a result of the breach." Brooks v.

AIG SunAmerica Life Assur. Co., 480 F.3d 579, 586 (1st Cir. 2007).

1.     Green Cannot Establish a Breach of the Plan

Here, the parties do not dispute that the Plan constituted a valid, written contract between

D2L and Green. Instead, the parties' dispute is fundamentally one of contract interpretation.

Under Massachusetts law, contract interpretation is a question of law. Freelander v. G. &

K. Realty Corp., 357 Mass. 512, 516, 258 N.E.2d 786 (1970). Contract ambiguity is also a

question of law. Id. "[A]n ambiguity is not created simply because a controversy exists between

the parties, each favoring an interpretation contrary to the other." Lumbermens Mut. Cas. Co. v.

Offices Unlimited, Inc., 419 Mass. 462, 466, 645 N.E.2d 1165 (1995). Rather, "a contract is only

ambiguous where an agreement's terms are inconsistent on their face or where the phraseology

can support reasonable differences of opinion as to the meaning of the words employed or the obligations undertaken." Bank v. International Bus. Machs. Corp., 145 F.3d 420, 424 (1st Cir. 1998) (internal quotation marks omitted). But where a contract is unambiguous and not fraudulent, "one who signs a written agreement is bound by its terms whether he reads and understands it or not." Greene v. Ablon, 794 F.3d 133, 146 (1st Cir. 2015) (quoting Spritz v. Lishner, 355 Mass. 162, 243 N.E.2d 163, 164 (1969)).

a.      The Unambiguous Windfall Clause Applied to the SNHU Deal

Section 5.1 of the GPP provided four definitions of a non-standard deal that would constitute a "windfall." The third of these definitions, subsection (c), which is at issue here, specified that a "windfall" was a deal that: "results in the aggregate of the Participant's Commissionable ACV and Commissionable Service Bookings for the individual deal or portion thereof exceeding 200% of the Participant's Quota for the year." Def.'s Mem. SJ, Ex. 3 [Doc. No. 147-3]. That language is not ambiguous: it provides a defined, quantifiable metric by which a particularly large deal may be categorized as a windfall.

Green's personal belief that the windfall clause meant something else does not alter this result. She points to nothing in the language itself to support the claim that the term was ambiguous. See, e.g., General Hosp. Corp. v. Esoterix Genetic Lab'ys, LLC, 16 F.4th 304, 308 (1st Cir. 2021) ("Contract language is ambiguous where the phraseology can support a reasonable difference of opinion as to the meaning of the words employed and the obligations undertaken.") (internal quotation marks omitted). Instead, Green contends that statements made to her by Adam King that D2L "never invokes" the windfall provision caused her to "disregard" it. Green Dep. 123:9-13, 124:20-24 [Doc. No. 185-2]. Even if King's statements are somehow admissible as parol evidence (which Plaintiff has not demonstrated), they do not suggest that the

11

Windfall clause has a different meaning. Instead, they suggest that D2L may not choose to exercise its discretion in enforcing the clause, or that the clause was of minimal importance. Those inferences do not negate or alter the plain meaning of "windfall" within the compensation plan.

Further, Green's definition of "windfall" as a "bluebird" opportunity that "falls into your lap" is effectively encompassed by subsection (d) of Section 5.1. Compare Def.'s Mem. SJ, Ex. 3 [Doc. No. 147-3] with Green Dep. at 118:16-20 [Doc. No. 185-2]. The contract covered Green's definition of a "windfall," *and* it clearly included additional definitions.

And the undisputed evidence shows that the SNHU deal fell squarely within Subsection (c)'s parameters. Green's annual quota in 2017 was $800,000; the SNHU deal was calculated at $2,199,459.79. Green Resp. SOF ¶¶ 9, 35-36 [Doc. No. 187]. The SNHU deal therefore met Subsection (c)'s cutoff by no small margin—the deal was 275% of Green's annual quota.

For these reasons, the court finds that the plain language of the Windfall Clause of the GPP applies to the SNHU deal.

> b.   The Windfall Clause Was Properly Invoked on June 20, 2017

The Windfall Clause provides that "[a] closed sale considered a windfall will be so designated prior to execution of the contract governing such sale. Only executive management can invoke the Windfall Clause." Def.'s Mem. SJ, Ex. 3 [Doc. No. 147-3]. In her Amended Complaint, Green alleges that the Windfall clause was not invoked until July 14, 2017—after the deal closed on June 23, 2017. Am. Compl. ¶ 13 [Doc. No. 17]. In her Opposition, Green elaborates: she contends that the Windfall clause required unanimous executive approval to be "invoked," and that did not occur until CEO Baker's July email. Pl.'s Opp. Mem. SJ 5 [Doc. No. 186]. D2L argues that the Windfall clause does not require unanimous executive approval, and

that CFO Nussey and VP Biggs invoked the provision through the June 20, 2017 email chain in which each agreed that the clause should be applied to the pending SNHU deal. Def.'s Rep. Mem. SJ 1-2 [Doc. No. 193].

D2L has the correct read of the Plan. Nothing in Section 5.1 of the GPP mentions the necessity of "unanimous" or even "consensus" approval by all three members of executive management to properly invoke the clause. Def.'s Mem SJ, Ex. 3 [Doc. No. 147-3]. Green's only evidence for this extra-contractual requirement is the deposition testimony of CEO Baker. Pl.'s Opp. Mem. SJ 4-7 [Doc. No. 186]. But Baker's statements do not support Green's inferences. At best, Baker's testimony can be interpreted to mean that a "consensus" of the CRB is required to "mov[e] forward" on a decision regarding the final dollar value of a commission on a deal where the windfall provision has already been applied. See Pl.'s Opp. Mem. SJ, Ex. 1 at 40 [Doc. No. 185-1]. Neither Baker's testimony nor any other piece of evidence speaks to the necessity of unanimous approval from executive management (a body distinct from the CRB), or the need for a "consensus" of *any* body to designate a deal as one subject to the windfall provision—an issue distinct from the final calculation of commission once the designation has taken place.

D2L is also correct that the June 20, 2017 emails from Brandon Nussey and Kevin Biggs properly invoked the windfall clause. Both men qualified as "executive management," and so were capable of invoking the windfall clause. See Def.'s Mem. SJ, Ex. 3 [Doc. No. 147-3]. Green claims that because neither Nussey nor Biggs initiated the email chain discussing the windfall clause, neither man could possibly have "invoked" it. Pl.'s Opp. Mem. SJ 4 [Doc. No. 186]. That is too cramped a reading of the word "invoke." Nussey and Biggs "invoked"—i.e., "enforce[ed] or us[ed] a legal right"[9]—when they both affirmatively assented to the application

---

[9] Black's Law Dictionary, 10th Ed. (2014).

of the Windfall clause to the SNHU deal. Def.'s Mem. SJ, Ex. 28 [Doc. No. 147-28]. As

executive management, their go-ahead properly triggered Section 5.1. See Def.'s Mem. SJ, Ex. 3

[Doc. No. 147-3]. And because Nussey and Biggs invoked the Windfall clause three days before

the SNHU deal was closed, no violation of Section 5.1 occurred. See id.[10]

      2.     No Oral Contract Was Formed

"Oral contracts are as enforceable as written contracts so long as they are not barred by

the Statute of Frauds." Brewster Wallcovering Co. v. Blue Mountain Wallcoverings, Inc., 68

Mass. App. Ct. 582, 598-99 n.40, 864 N.E.2d 518 (2007). Here, however, the evidence cannot

support a finding that such an oral agreement exists.

Green asserts that Theriault responded to Green's inquiry about her SNHU commission

that "between 500 and 550,000 [dollars] is what she thought it was going to be." Green Dep.

187:22-188:8 [Doc. No. 185-2]. But that statement as to Theriault's expectations as to the

amount does not establish an enforceable contract. Moreover, even if the statement had been

more definite, Green has provided no evidence that Theriault had authority to bind D2L in

contract. See Bulwer v. Mount Auburn Hosp., 473 Mass. 672, 690, 46 N.E.2d 24 (2016).

For these reasons, Defendants' Motion for Summary Judgment as to Count II is

GRANTED.

---

[10] Green also objects to her supervisor's failure to elevate Green's dissatisfaction with her commission to the Sales Compensation Committee or CRB. Green Resp. SOF ¶ 5, 19 [Doc. No. 187]. Green has waived this argument by raising it for the first time in her Statement of Facts. Even if that were not the case, the argument lacks merit. Section 8.3 of the GPP, entitled "Issue Resolution Process," provides a recommended process for elevating a complaint. But the provision is just that: a recommendation, not a requirement. Def.'s Mem. SJ, Ex. 3 [Doc. No. 147-3] ("This process is set out herein for information purposes only and does not create any right or entitlement on the part of any Participant to a formal review of any issues which arise under the Plan"). As such, any claim that D2L breached of Section 8.3 of the GPP fails.

B.      *Unjust Enrichment*

"[A] party with an adequate remedy at law cannot claim unjust enrichment." Shaulis v. Nordstrom, Inc., 865 F.3d 1, 16 (1st Cir. 2017). For this reason, in its January 2021 Memorandum and Order, this court specifically stated that Green's unjust enrichment claim could survive only as to damages sustained from conduct outside the bounds of the contract between Green and D2L, e.g., the alleged improper denial of any upsell opportunities related to the SNHU deal. Mem. & Order 5 [Doc. No. 39]. Green has now conceded that she was not denied such opportunities. Green Dep. 239-240 [Doc. No. 185-2]. Green has also not put forth any evidence of any other conduct that would require an equitable remedy outside the scope of contract law. Green's fundamental contention is that she was not paid what she believes she was owed in commission on the SNHU deal; that dispute, as discussed in Section IV.A.1, can be resolved entirely by reference to principles of contract law. See Tomasella v. Nestlé USA, Inc., 962 F.3d 60, 84 (1st Cir. 2020). Green's Opposition "misapprehends the relevant law. It is the *availability* of a remedy at law, not the *viability* of that remedy, that prohibits a claim for unjust enrichment." See Shaulis, 865 F.3d at 16 (emphasis added).

For these reasons, Defendants' Motion for Summary Judgment as to Count III is GRANTED.

C.      *Breach of the Implied Covenant of Good Faith and Fair Dealing*

The covenant of good faith and fair dealing exists to ensure that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Uproar Co. v. Nat'l Broad. Co., 81 F.2d 373, 377 (1st Cir. 1936). The undisputed evidence shows that Green did, in fact, receive the "fruits of the contract" as to the

SNHU contract and she has come forward with no evidence of wrongdoing as to the other commissions.

For these reasons, Defendants' Motion for Summary Judgment as to Count IV is GRANTED.

D.    *Massachusetts Wage Act*

Under the Massachusetts Wage Act, an employer may not withhold duly owed compensation from an employee. M.G.L. c. 149 § 148; Tze Kit Mui v. Mass. Port. Auth., 478 Mass. 710, 711, 89 N.E.3d 460 (2018) ("[T]he purpose of the Wage Act is to protect employees and their right to wages.") (internal quotation marks omitted). No such withholding has occurred here.[11] Because the court finds that D2L has paid Green the commission owed her on the SNHU deal, see supra Section IV.A.1, Defendants' Motion for Summary Judgment as to Count I is GRANTED.

**V.    Conclusion**

Defendant's Motion for Summary Judgment on all counts is GRANTED.

IT IS SO ORDERED

September 15, 2023                                /s/ Indira Talwani
                                                 United States District Judge

---

[11] Any suggestion by Green that windfall provisions constitute per se withholdings is foreclosed by First Circuit precedent. See Klauber v. Vmware, Inc., No. 22-1417, 2023 WL 5344921, *7 (1st Cir. Aug. 11, 2023) ("Under Massachusetts law, employers and employees may agree to contingencies that must be satisfied before commission payments become due and payable.").